7 P.3d 131

### In re PAUL M.

No. 2 CA–JV 99–0064.

Court of Appeals of.Arizona, Division 2, Department A.

June 15, 2000.

Chris M. Roll, Cochise County Attorney By James E. Sherman, Bisb, Attorneys for State.

Margaret L. Macartney, Cochise County Legal Defender By Joel A. Larson, Bisbee, Attorneys for Minor.

## OPINION

FLÓREZ, Judge.

¶1 The minor, born February 20, 1985, was adjudicated delinquent for violating A.R.S. § 15–507 by knowingly abusing a teacher or other school employee engaged in the performance of her duties, a class three misdemeanor. The juvenile court placed the minor on unsupervised probation until he had written two letters of apology and had either completed forty hours of "community work service" or paid a $200 fine in lieu of working. The minor appeals the adjudication, arguing that his vulgar words and defiant behavior toward a teacher's aide did not amount to "abuse" of a school employee within the meaning of § 15–507. "The interpretation of a statute is a question of law, which we review *de novo*." *Phoenix Newspapers, Inc. v. Arizona Dept. of Econ. Sec.*, 186 Ariz. 446, 448, 924 P.2d 450, 452 (1996); *In re Maricopa County Juvenile Action No. JD–6236*, 178 Ariz. 449, 874 P.2d 1006 (1994).

¶2 Evidence at the adjudication hearing established that in January 1999, a teacher's aide at Benson Middle School was monitoring the playground during the lunch hour when she overheard the then-thirteen-year-old minor saying to a group of four or five other boys "that he was going to kick somebody's f——ing ass." Concerned that there might be a fight, the aide, who was approximately five feet behind the minor at the time, told the minor "that he wasn't going to kick anybody's butt." At this, the minor stopped, turned "aggressively" to face the aide, and told her in a loud tone to "[f]—— off." The aide told the minor he needed to accompany

her to the office, to which the minor replied that "he wasn't going f——ing anywhere with [her]." When she repeated her request that he accompany her to the office, the minor "turned around, started walking away, and told [her] to f—— off again." The aide testified the minor told her to "[f]—— off" four times in all before she "went to the office and got [the principal]."

¶ 3 The sole question presented by this appeal is whether, by repeatedly telling the teacher's aide to "[f]—— off," the minor knowingly abused a school employee in violation of A.R.S. § 15–507, which provides: "A person who knowingly abuses a teacher or other school employee on school grounds or while the teacher or employee is engaged in the performance of his duties is guilty of a class 3 misdemeanor." The term "abuses" is not defined in Title 15, and we have found no cases decided under § 15–507 (formerly A.R.S. § 15–201) to guide our interpretation. However, we note that, until the statute was amended in 1989, the offense could be committed by "insult[ing] or abus[ing]" a teacher. 1978 Ariz. Sess. Laws, ch. 201, § 255. The 1989 amendment expressly deleted "insults" from the statute, while adding "other school employee[s]" to the class of those protected from abuse while engaged in the performance of their duties on school grounds. 1989 Ariz. Sess. Laws, ch. 124, § 1.

¶ 4 Our goal in construing a statute is to discern and give effect to the intent of the legislature. *Mail Boxes v. Industrial Comm'n*, 181 Ariz. 119, 888 P.2d 777 (1995). Toward that end, "we consider the statute's context; its language, subject matter, and historical background; its effects and consequences; and its spirit and purpose." *Hayes v. Continental Ins. Co.*, 178 Ariz. 264, 268, 872 P.2d 668, 672 (1994). "Legislative intent often can be discovered by examining the development of a particular statute." *Carrow Co. v. Lusby*, 167 Ariz. 18, 20, 804 P.2d 747, 749 (1990); *see also State v. Takacs*, 169 Ariz. 392, 819 P.2d 978 (1991). Here, we believe the revision of § 15–507 in 1989 was a significant event in the development of the present statute.

¶ 5 The state theorizes that the legislature deleted "insults" from the statute because the subjective meaning of that term "varies [so] wildly from culture to culture, class to class, and era to era" as to arguably render the statute unconstitutionally vague or overbroad. In the state's view, "most words or actions which people might regard as insulting will also be abusive, and those that are not do not need to be criminalized." In effect, the state contends that the 1989 amendment made no real change in the scope of the statute because "most" insulting behavior is also abusive. We do not agree that the terms are essentially synonymous nor that "to insult" is necessarily also "to abuse." Nor, parenthetically, do we believe the definition of "abuse" enjoys any wider consensus than the definition of "insult."

¶ 6 To accept the state's argument that "abusing" includes "insulting" would mean that the legislature's amendment of § 15–507 was purely formal, without substantive significance or practical effect. Such a conclusion violates the rule of statutory construction that requires us to presume that "when the legislature alters the language of a statute[,] it intended to create a change in the existing law." *State v. Bridgeforth*, 156 Ariz. 60, 63, 750 P.2d 3, 6 (1988) (holding that deletion of "and intentionally" from phrase "knowingly and intentionally" in A.R.S. § 13–2310 changed necessary mens rea to require knowledge only). We conclude that the amendment of § 15–507 reflects the legislature's intention that insulting words alone should no longer qualify as criminal abuse under the statute.

¶ 7 Our task, then, is to determine what does constitute such abuse. "[A]n undefined word or phrase in a statute is to be given its ordinary meaning unless it appears from the context or otherwise that a different meaning is intended...." *Sierra Tucson, Inc. v. Pima County*, 178 Ariz. 215, 219, 871 P.2d 762, 766 (1994); *see also Mail Boxes*. To determine the ordinary meaning of "abuse," we may refer to "an established, widely respected dictionary." *State v. Wise*, 137 Ariz. 468, 470 n. 3, 671 P.2d 909, 911 n. 3 (1983); *see also Sierra Tucson*. According to Webster's Third New International Dictionary 8 (1971), to "abuse" means "to attack or

injure with words: reproach coarsely: disparage." *The American Heritage Dictionary* 70 (2d college ed.1991) variously defines "abuse" to mean "[t]o hurt or injure by maltreatment [or][t]o assail with contemptuous, coarse, or insulting words; revile." The same source defines "revile" as "[t]o denounce with abusive language," *id.* at 1058, and to "denounce" in turn is defined as to "condemn openly ... censure[;] [t]o accuse formally." *Id.* at 381.

¶ 8 Here, the teacher's aide testified the minor did not call her names, did not "flip [her] off," and did not intimidate her; rather, he used vulgarity, had a rude attitude, and talked back to her. Although the minor's behavior was insolent and offensive, his words did not "attack," "injure," "disparage," "revile," or "denounce" the aide personally. In an earlier, more genteel era, the sentiment communicated by this minor's words might have been expressed as "go away," "leave me alone," or "get out of my face." His words were crude, disrespectful, and wholly inappropriate, but they were not a disparaging or hurtful attack on the aide personally. We believe the comments were, at most, insulting to the aide's authority. "Insult" means "to treat with insolence, indignity, or contempt by word or action: affront wantonly." *Webster's Third New International Dictionary* at 1173.

¶ 9 It appears from the transcript that the juvenile court likewise found the minor's words insulting and based its adjudication on an unnamed dictionary source in which the definition of "abusive" included "[i]ll treatment by coarse or insulting words." The court stated, "the reference given by defense counsel[,] under the term 'abusive,' it does talk about, 'Ill treatment by coarse or insulting words.' So, it seems to me very consistent with the definition held in Webster's." Thus, the juvenile court's ruling appears to rest on its having equated "coarse or insulting" with "abusive."

¶ 10 As noted above, however, "abuse" connotes conduct more serious, more purposefully injurious, and more potentially harmful than insulting words or disrespectful behavior. We find tangential support for this conclusion in the decision by Division One of this court in *In re Louise C.*, 307 Ariz. Adv. Rep. 11, (Ariz.App. October 28, 1999), and the supreme court's more recent decision in *In re Julio L.*, No. CV-99-0377-PR (Ariz. June 1, 2000). In *Louise C.*, the minor was not charged with abuse of a school employee under § 15–507 but with disorderly conduct in violation of A.R.S. § 13–2904(A)(1) and (A)(3), a class one misdemeanor. She had been summoned to the principal's office to discuss a disagreement between herself and another student.

After [the assistant principal] asked [the] Juvenile if she was planning to fight this other student, Juvenile "lashed out" at him. She said, "F[——] this. I don't have to take this s[——]." When Juvenile stood up and walked towards the door, the assistant principal asked her to stop. Juvenile then said, "F[——] you. I don't have to do what you tell me," and she opened the door and left the office, slamming the door behind her.

*Louise C.*, 307 Ariz. Adv. Rep. 11, ¶ 2 Division One reversed the juvenile court's adjudication of delinquency, finding that the minor's speech and conduct were "offensive and unacceptable," *id.* at ¶ 8, but did not constitute fighting words or seriously disruptive behavior. *Id.* at ¶ 11. The court noted that the minor's "speech was not likely to provoke an ordinary citizen to a violent reaction, and it was less likely to provoke such a response from a school official, the alleged victim in this case." *Id.* at ¶ 8. By extension, if one student's "F[——] this[;] I don't have to take this s[——]," and "F[——] you[;] I don't have to do what you tell me," punctuated by door-slamming, are not disorderly conduct under § 13–2904(A)(1) or (A)(3), it seems inconsistent, at the least, that another student's "[f]—— off" and refusal to go to the principal's office should rise to the level of criminal abuse of a school employee.

¶ 11 In *Julio L.*, the minor was likewise charged with disorderly conduct in violation of § 13–2904(A)(1) for engaging in "seriously disruptive behavior." After ignoring three requests by his school principal to speak with her outside the classroom, the minor, in the

presence of other students, looked directly at her, said "F— you," then kicked over a molded plastic chair. Holding that behavior did not rise to the level of disorderly conduct, the supreme court observed:

> We do not condone the type of behavior in question, but must keep in mind the difference between civil and criminal conduct. Our laws do not make criminals out of adults or juveniles just because they act offensively or rudely or lack respect and control. . . .
>
> We are, of course, quite aware that the schools need the support of our legal system. Under the current statutes, however, we cannot equate a child's acting out through cursing or through angry or defiant words and actions with conduct proscribed by the current criminal statute. We will not attempt to do so by stretching the statute to punish school behavioral problems of a type that, though unfortunately all too common, neither injure or threaten any person nor seriously disrupt any school class or function.

*Julio L.*, slip op. at ¶¶ 13, 14.

¶ 12 We find the court's reasoning equally applicable to the different statute at issue here. In the absence of a legislative definition of "abuse," we believe the term should be reserved for conduct very different in degree, if not also in kind, from the minor's vulgar words and defiant actions here. That the minor's behavior was inappropriate and thoroughly offensive is beyond dispute, as is the school's unquestioned right to impose such disciplinary consequences as the five-day suspension from school mentioned by the court. The question before us, however, is whether the brazen impudence and gratuitous vulgarity of a thirteen-year-old constitute abuse under § 15–507. We find that, by removing "insults" from the statute, the legislature signaled its intent to criminalize only truly abusive conduct and to exempt knowingly "insult[ing]" a teacher or school employee from the scope of § 15–507. Because the juvenile court's finding of responsibility hinged on the "coarse or insulting" nature of the minor's words, we conclude the court erred as a matter of law in finding the minor responsible for violating § 15–507. We

therefore vacate its orders of adjudication and disposition.

CONCURRING: WILLIAM E. DRUKE, Judge.

PELANDER, Presiding Judge, dissenting.

¶ 13 I respectfully dissent. It is undisputed that the minor "knowingly" directed his verbal barrage at a "school employee on school grounds" while the employee was "engaged in the performance of [her] duties." § 15–507. Thus, the only issue is whether the evidence of the minor's conduct and language supported a finding that he had "abused" the teacher's aide, for purposes of § 15–507, as the juvenile court found. Because no valid basis exists for disturbing that finding, I would affirm.

¶ 14 The majority relies in part on several dictionary definitions of the term "abuse" to support its conclusion that § 15–507 does not proscribe the minor's conduct. Those and other dictionary definitions, however, support a contrary conclusion. *See, e.g., The American Heritage Dictionary* 70 (definition of the verb "abuse" includes "[t]o assail with contemptuous, coarse, or insulting words; revile"; synonyms include "mistreat" and "illtreat"; and noting that "[a]buse applies to wrongful or unreasonable treatment by deed or word"); *Black's Law Dictionary* 10 (7th ed.1999) ("abuse" means "[t]o depart from legal or reasonable use in dealing with (a person or thing)"); *Black's Law Dictionary* 10 (5th ed. 1979) (" 'Abuse' means to wrong in speech, reproach coarsely, disparage, revile, and malign.").

¶ 15 Whether a person's conduct or language constitutes "abuse" depends on a case-by-case factual analysis of the surrounding circumstances and context. Here, the minor repeatedly directed profanity to the teacher's aide by telling her four times to "[f]— off," including after she had specifically requested him to accompany her to the school office; the minor took an aggressive stance toward the aide and spoke in a loud tone of voice; and some four to five other students were in the immediate vicinity of the occurrence. Given that context, contrary to the majority's

conclusion as a matter of law, the juvenile court could well have found as a matter of fact that the minor's words were "a disparaging or hurtful attack on the aide personally." ¶ 8. *See The American Heritage Dictionary* 406 ("disparage" means "[t]o speak of as unimportant or small; belittle," or "[t]o reduce in esteem or rank").

¶ 16 That the minor did not personalize his vulgarity, call the aide a name, or intimidate her does not make his language any less "contemptuous" or "coarse." *The American Heritage Dictionary* 70. And, reasonable minds could conclude, as the juvenile court implicitly did, that the minor "depart[ed] from ... reasonable use in dealing with" the aide. *Black's Law Dictionary* 10 (7th ed.1999). "In-your-face" profanity by a teenage student repeatedly directed at a teacher or aide who is performing her duties at school certainly may go beyond a mere administrative disciplinary matter and cross the line, however finely the line may be drawn, into delinquent/misdemeanor conduct. Considering all the circumstances, the juvenile court did not err in finding the then-thirteen-year-old minor's behavior encompassed and proscribed by § 15–507.

¶ 17 The majority unduly emphasizes the 1989 legislative deletion of "insults" from the statute. Although any theorizing as to the legislature's underlying reasoning and intended meaning of the amendment is speculative, the term "insults" arguably is more subjective and nebulous than "abuse." But regardless of any alleged overlap or relationship between those terms, and assuming the statute is intended "to criminalize only truly abusive conduct," ¶ 12, the delinquency adjudication here is neither prohibited by nor inconsistent with the amended statute.

¶ 18 Neither *In re Julio L.* nor *In re Louise C.* compels reversal here. Those cases involved a charge of disorderly conduct under § 13–2904(A)(1) and/or (3) which, unlike § 15–507, requires proof of "fighting, violent or seriously disruptive behavior," § 13–2904(A)(1), and use of "abusive or offensive language or gestures ... in a manner likely to provoke immédiate physical retaliation." § 13–2904(A)(3). Because disorderly conduct is a more severe charge than abuse and requires proof of several additional elements, *compare* § 13–2904 *with* § 15–507, *Julio L.* and *Louise C.* are not controlling here.

¶ 19 As the court noted in *Julio L.*, "not every violation of public decorum or of school rules gives legal cause for criminal adjudication," *Julio L.*, slip op. at ¶ 7, and there indeed may be "a difference between merely rude or offensive behavior and criminal conduct." *Id.* at ¶ 10. But it is the legislature's role, not this court's, to state what constitutes a crime. *See State v. Hickey,* 114 Ariz. 394, 396–97, 561 P.2d 315, 317–18 (1977) ("[L]egislatures possess broad discretion to define criminal offenses and prescribe penalties therefor."); *State v. Ramsey,* 171 Ariz. 409, 413, 831 P.2d 408, 412 (1992) ("The legislative department has the power to define what conduct constitutes a crime and the power to prescribe punishment for that conduct."). I would affirm.