117 P.3d 795

**LINDA V., Appellant,**

v.

**ARIZONA DEPARTMENT OF
ECONOMIC SECURITY and
Anyssa V., Appellees.**

**No. 1 CA–JV 04–0180.**

Court of Appeals of Arizona,
Division 1, Department A.

Aug. 9, 2005.

her fundamental rights to parent Anyssa. We disagree and affirm the termination of her parental rights.

## FACTS AND PROCEDURAL BACKGROUND

¶ 2 The underlying facts are undisputed. After moving to Phoenix in October 2003 with her two daughters, four-year-old Ashley and twenty-one-month-old Anyssa, Mother witnessed her boyfriend violently shaking Ashley and saw severe bruises on Ashley's buttocks. The boyfriend admitted abusing Ashley but told Mother he would stop. The abuse did not stop: in later weeks, Mother and other family members observed bruises on Ashley's face, arms, and back.

¶ 3 Ashley died on January 4, 2004. The boyfriend admitted to the police that he had fatally beaten Ashley. He had hit her in the stomach area with a closed fist and had thrown her down against the wall or floor after he had driven Mother to work on January 3, 2004. Later, he noticed that Ashley had stopped breathing and tried to revive her. She vomited and appeared to resume breathing. He did not seek medical attention for Ashley or tell Mother.

¶ 4 Early the next morning, the boyfriend discovered that Ashley had died. Mother and boyfriend drove the child to the hospital approximately twenty to forty minutes later, but stopped on the way at the boyfriend's sister's house to drop off Anyssa. The hospital personnel recognized that Ashley had been dead for hours and counted approximately 175 bruises on her.

¶ 5 ADES filed a dependency petition to protect Anyssa, and she was found dependent as to both Mother and Mother's boyfriend, her father. The juvenile court later severed the boyfriend's parental rights. After the court terminated Mother's parental rights, she filed a notice of appeal. We have jurisdiction pursuant to Article 6, Section 9, of the Arizona Constitution, and Arizona Revised Statutes ("A.R.S.") sections 8–235(A) (Supp.2004), 12–120.21(A)(1) (2003), and – 2101(B) (2003).

Terry Goddard, Attorney General, By Stacy L. Shuman, Assistant Attorney General, Phoenix, Attorneys for Appellees.

Susan Sherwin, Office of the Legal Advocate, By Leslie Hatfield, Deputy Legal Advocate, Phoenix, Guardian ad Litem for the Minor Child.

Gary V. Scales, Phoenix, Attorney for Appellant.

## OPINION

PORTLEY, Judge.

¶ 1 Linda V. ("Mother") challenges the juvenile court's order terminating her parental rights to her daughter Anyssa. She contends that the Arizona Department of Economic Security ("ADES") did not prove by clear and convincing evidence that she abused her daughter. She further argues that her boyfriend's murder of her other daughter, Ashley, should not be considered. Finally, she maintains that the court violated

## DISCUSSION

¶ 6 Although a parent's right to care, custody, and control of his or her children has long been recognized as fundamental, *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000); *Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 248, ¶ 11, 995 P.2d 682, 684 (2000); *Matter of Juv. Action No. JS–500274*, 167 Ariz. 1, 5, 804 P.2d 730, 734 (1990), it is not absolute. *Michael J.*, 196 Ariz. at 248, ¶ 12, 995 P.2d at 684. The State may terminate a parent's fundamental right to a child under statutorily enumerated conditions after following specified procedures. *Id.* "To justify termination of the parent-child relationship, the trial court must find, by clear and convincing evidence, at least one of the statutory grounds set out in [A.R.S.] section 8–533, and also that termination is in the best interest of the child." *Id.* at 249, ¶ 12, 995 P.2d at 685; *see* A.R.S. § 8–533(B) (Supp.2004).

¶ 7 Mother contends that because she did not abuse or neglect Anyssa, the juvenile court erred in basing its termination order on A.R.S. § 8–533(B)(2).[1] That subsection states that termination may occur when:

> [T]he parent has neglected or wilfully abused a child. This abuse includes serious physical or emotional injury or situations in which the parent knew or reasonably should have known that a person was abusing or neglecting a child.

A.R.S. § 8–533(B)(2). ADES counters that the subsection permits the juvenile court to terminate parental rights if the parent abused or neglected the child, another child, or knew or had reason to know that another child was being abused by someone else. We review de novo the juvenile court's interpretation of this statute. *In re Kyle M.*, 200 Ariz. 447, 448, ¶ 6, 27 P.3d 804, 805 (App. 2001).

¶ 8 When construing statutes our first duty is to ascertain and give effect to the legislature's intent. *In re Adam P.*, 201 Ariz. 289, 291, ¶ 12, 34 P.3d 398, 400 (App.

2001). While seeking the intent of the legislature, we first look at the plain wording of the statute. *Id.* When a "statute is clear and unambiguous, we apply it without using other means of statutory construction," *Aros v. Beneficial Ariz., Inc.*, 194 Ariz. 62, 66, 977 P.2d 784, 788 (1999), if such meaning is constitutional. *Garrison v. Luke*, 52 Ariz. 50, 55, 78 P.2d 1120, 1122 (1938). However, if the terms are ambiguous, we determine legislative intent by looking at "the statute's context, subject matter, historical background, effects and consequences, and spirit and purpose." *Aros*, 194 Ariz. at 66, 977 P.2d at 788 (quoting *Zamora v. Reinstein*, 185 Ariz. 272, 275, 915 P.2d 1227, 1230 (1996)).

¶ 9 Section 8–533 lists the different statutory bases to terminate parents' rights to care, custody, and control of their child. As noted above, subsection (B)(2) justifies termination if "a child" is abused or neglected by either the parent or another person and the parent knew or should have known about the abuse or neglect. ADES argues that this subsection permits the juvenile court to terminate parents' rights to any of their children if the agency proves that the parents either abused or neglected another child, or knew or had reason to know that another child was being abused by someone else. This interpretation was impliedly adopted by the juvenile court to severe Mother's parental rights to Anyssa.

¶ 10 We first note that the phrase "a child" contained in § 8–533(B)(2) is ambiguous because it is readily capable of vastly different interpretations. Among other possible meanings, that phrase can mean "the child" or "another child of the parent." Both of these potential meanings are found elsewhere within § 8–533.

¶ 11 In § 8–533(A), the phrase "a child" appears to mean "the child." That subsection states:

> Any person or agency that has a legitimate interest in the welfare of *a child*, including, but not limited to, a relative, a foster par-

---

1. Mother does not argue that the statute is facially unconstitutional, and we therefore address only its application on the facts of this case.

ent, a physician, the department of economic security or a private licensed child welfare agency, may file a petition for the termination of the parent-child relationship alleging grounds contained in subsection B of this section.

A.R.S. § 8–533(A) (emphasis added). Logically, the phrase "a child" in this context means "the child" rather than "any child" or "another child of the parent" because a "person" or "agency" must first have some contact with a specific child before a petition can be filed. Although ADES and other agencies have responsibility to protect children generally, that duty alone is not sufficient to permit the agency to file a petition with regard to a specific child. Furthermore, the terms "relative," "foster parent," and "physician," each imply a relationship between that person and an individual child rather than children in general. Any other interpretation of "a child" would create an absurd result, and we will not interpret the statute that way. *Garrison,* 52 Ariz. at 56, 78 P.2d at 1122.

¶ 12 The same phrase is also found in subsection (B)(7), which states that the court may terminate a parent-child relationship if "the parents have relinquished their rights to a child to an agency or have consented to the adoption." A.R.S. § 8–533(B)(7). Again, the only logical interpretation of "a child" in this subsection is "the child." Permitting the court to terminate a parent's rights to one child merely because she has given up another child for adoption is not, by itself, sufficient to justify terminating a parent's rights.

¶ 13 In other subsections of § 8–533(B), the legislature used the phrase "the child" when it intended to refer to a specific child whose relationship with a parent was to be terminated. *See* A.R.S. § 8–533(B)(1), (4), (8), and (11). Furthermore, other subsections of the statute use "another child" and "another child of the parent" when referring to a different child of that same parent whose rights are to be terminated with respect to the child named in the termination petition. *See* A.R.S. § 8–533(B)(4), (10).

¶ 14 Although the phrase "a child" can have different meanings, we need not address the many potential interpretations aside from either "the child" [2] or "another child of the parent" because we are presented with only one set of facts. Here, Ashley was fatally abused, and Anyssa was removed because of that abuse; we therefore focus on whether "a child" in the statute means "the child" who was abused or "another child of the parent" who was not abused. We need not determine whether the language is intended to limit the meaning of the phrase to "the child," i.e., the child who is the subject of the termination petition, or to "another child of the parent," i.e., a different child of that parent who is not the subject of the termination petition. Although the statute may appear ambiguous, when the statute is examined in light of the pre-existing statutory language, the legislature's meaning is clear. Accordingly, based on the statutory language and context we hold that § 8–533(B)(2) can mean that parents who abuse or neglect their children, or who permit another person to abuse or neglect their children, can have their parental rights to their other children terminated even though there is no evidence that the other children were abused or neglected. Indeed, that is the very fact situation that prompted the legislature to change the statute.

¶ 15 The legislative committee minutes reflect that the legislature acknowledged various interpretations of this language and that this interpretation was intended. *See Minutes of S. Comm. on Appropriations,* 43rd Leg., 1st Regular Sess. (Mar. 26, 1997), http:/

---

2. In 1997, this subsection was amended from its former language, "the child," to its present language, "a child." 1997 Ariz. Sess. Laws, ch. 222, § 49. Generally, "[w]hen the legislature modifies the language of a statute, we must presume it intended to change the existing law." *In re Kyle M.,* 200 Ariz. at 450, ¶ 14, 27 P.3d at 807. *See also Washburn v. Pima County,* 206 Ariz. 571, 576, ¶ 11, 81 P.3d 1030, 1035 (App.2003) ("[W]e presume the legislature intends to change the law when it substantively changes the language of a statute."). Thus, we must give effect to the legislature's substitution of "the child" with "a child." To read the two different versions as being identical "would mean that the legislature's amendment ... was purely formal, without substantive significance or practical effect," a result prohibited under the rules of statutory construction. *In re Paul M.,* 198 Ariz. 122, 124, ¶ 6, 7 P.3d 131, 133 (App.2000).

/www.az leg.state.az.us /CommitteeInfo. asp?Committee—ID =63 (statements by Sen. Peter Rios and Sen. Gary Richardson regarding H.B. 2255). When asked about the purpose for the language change, the Attorney General representative responded that the amendment was intended to give ADES the authority to remove children from parents who had already murdered or seriously injured other children although there was no evidence that the parent had injured the child at issue. Senator Richardson asked whether "a child" could mean an unrelated child. The representative confirmed it could theoretically have that meaning but the requirement that the termination grounds must be proven by clear and convincing evidence would prevent use of the statute for improper purposes.

¶ 16 Based upon our interpretation of the statute and review of the record, the juvenile court properly determined that statutory grounds for termination existed to sever Mother's rights to Anyssa. We next address whether the termination of Mother's parental rights to Anyssa is in the child's best interest.

■ ¶ 17 Mother argues that ADES failed to prove that terminating her rights was in Anyssa's best interest. At trial, witnesses testified that termination would be in Anyssa's best interest, she is adoptable, and she was doing well in her current placement. The ADES employee assigned to this matter testified that Mother's neglect resulted in Ashley's death. Her opinion was that Mother would "handle Anyssa the same way" that she had handled Ashley. She testified that

"the risk [was] very high that [Anyssa] would suffer abuse" if Anyssa were returned to Mother's care. In addition, Dr. Kathryn Coffman, a pediatrician who had examined Anyssa as well as Ashley's medical reports, testified that she would be "very concerned about any child being in [Mother's] care" based on Mother's failure "to take any steps to protect" Ashley despite Mother's knowledge that the abuse was taking place. As Dr. Coffman put it, "for two months at least [Ashley] was beaten while in [Mother's] care, that she continued to leave the child in harm's way, and the child ended up dying a very painful death" due to Mother's knowing failure to protect her. Our review of the record reveals sufficient evidence to uphold the juvenile court's best interest finding. *See Kent K. v. Bobby M.*, 210 Ariz. 279, 288, ¶ 42, 110 P.3d 1013, 1022 (2005) (holding that best interest of child need only be proven by a preponderance of the evidence).[3]

## CONCLUSION

¶ 18 Based on the foregoing, we affirm the termination of Mother's parental rights to Anyssa.

CONCURRING: DANIEL A. BARKER, Presiding Judge and SUSAN A. EHRLICH, Judge.

---

3. Although, in this case the constitutional requirement of showing a nexus between the abuse or neglect committed on *the* child who was abused (Ashley) and the risk that such abuse would occur to a different child (Anyssa) to whom parental rights were being severed, was established, we are not faced with, nor do we address, a scenario where there has been prior conduct by a parent that is remote in time with regard to the child to whom parental rights have been severed.